[See Case No. 6,256.]

HAYDEN (MANNING v.).   See Case No. 9,-043.

# Case No. 6,261.

## HAYDEN v. SUFFOLK MANUF'G CO.

[4 Fish. Pat. Cas. 86; Merw. Pat. Inv. 664.] [1]

Circuit Court, D. Massachusetts.   Oct., 1862. [2]

PATENTS — PATENTEE MUST BE FIRST INVENTOR — CLAIM OF LETTERS PATENT — SPECIFICATION — IMPROVEMENT IN COTTON CLEANERS — WEIGHT OF TESTIMONY OF WITNESSES — PERFECTED INVENTION — SCOPE OF DAMAGES FOR INFRINGEMENT — VERDICT — EFFECT UPON RIGHT TO USE INFRINGING DEVICES.

1. To entitle him to any exclusive privilege, a patentee must not only be an original inventor, but the first inventor.

2. The claim of letters patent is the conclusion, which sets forth distinctly what is the invention which the inventor asks to be secured to him by his patent.

3. The preceding specification is referred to, and examined, in connection with the claim only to explain the latter, and ascertain its true extent.

4. The claim being for scores filled with metal or cement, and the use of shellac varnish having been spoken of in the specification, the varnish thereby becomes the equivalent of the cement for the purpose of filling the scores.

[Cited in Consolidated Roller Mill Co. v. Coombs, 39 Fed. 33.]

5. A claim for "covering the partitions of an elongated trunk with woven wire, having the scores filled with metal or cement," is not infringed by the use of a similar elongated trunk with its partitions covered with a screen of woven wire, the scores of which were not filled with metal, cement, or their equivalents.

6. Two things are to be regarded in weighing the testimony of all who testify: the ability of the witness to tell the truth, and his disposition to tell the truth.   These do not always go together.

7. The ability to tell the truth, as to past transactions, may depend upon the accuracy of the observation, or of the knowledge at the time; upon the occasion that the party has had to keep it in his mind and memory since; and in the tenacity of his memory.

8. When the testimony relates to machinery, the question whether the person had a full knowledge at the time may depend upon his habit of accurate observation, his opportunity of observing the particular structure or machine, and his intelligence or understanding of it.

9. If the testimony as to want of novelty leaves the question in entire doubt, the party whose duty it is to prove it has not maintained the burden of proof.

10. Where varnish was applied in a prior machine, for the purpose of filling the scores, the presumption would be, if the party was competent, that he accomplished the purpose; otherwise, if the varnish was applied for another purpose, the filling of the scores being incidental only.

11. A perfected invention is one which is brought to such a condition as to be capable of practical use.

12. An experiment, or series of experiments, ending in experiment and abandoned, is not a perfected invention that can defeat a subsequent patent obtained by another inventor.

13. If experiments tend to a certain point, but there is no certainty to what extent they went, the subsequent conduct of the parties who made the experiments may aid in determining what they accomplished.

14. The greater the importance of the invention, the less the probability that, if achieved, it would have been laid aside.

15. Where a useful machine is sought to be invalidated by an old machine, made years ago, the testimony should be examined with care and caution, to ascertain whether the prior machine was actually and substantially the same.

[Cited in Cook v. Ernest, Case No. 3,155; Washburn & Moen Manuf'g Co. v. Haish, 4 Fed. 905.]

16. Although the plaintiff's patent creates a prima facie case for him, as to the validity of the patent, it creates no presumption that any person has infringed upon it.

17. A verdict for damages gives no right to the defendants to use the infringing devices.

[See note at end of case.]

18. The damages should have reference to the scope of the invention of the plaintiff, and the extent to which it enters into the infringing machine.

[See note at end of case.]

This was an action on the case, tried before Judge Sprague and a jury, which was originally brought to recover damages for the infringement of letters patent [No. 18,-742] for "improvement in long trunks for cleaning cotton," granted to plaintiff [Isaac Hayden] December 1, 1857, and also of letters patent [No. 29,971] for "improvement in cotton cleaners," granted to plaintiff, September 11, 1860.

Upon the trial, the plaintiff having put these patents, marked "B" and "C" respectively, in evidence, and having introduced evidence tending to show an infringement of both, the defendants introduced, by way of defense, a copy of letters patent [No. 16,833] for machinery for cleaning and separating cotton, wool, fur, and other fibrous materials, marked "A," also issued to the plaintiff, and bearing date March 17, 1857. It was agreed by the parties that these several letters patent were applied for in the following order:

C, applied for December 11, 1854.
A,   "   for November 1, 1855.
B,   "   for June 15, 1857.

[1] [Reported by Samuel S. Fisher, Esq., and here reprinted by permission.   Merw. Pat. Inv. 664, contains only a partial report.]

[2] [Affirmed in 3 Wall. (70 U. S.) 315.]

Evidence was introduced on both sides, tending to show that, prior to the alleged invention or inventions of the plaintiff, cotton had been cleaned by blowing it from an opening machine, through long trunks of various lengths, from twenty to one hundred feet long, provided with a screen or grating, sometimes consisting of wooden bars and sometimes of a plate of metal, perforated with holes half an inch wide and two inches long; that some portion of the dirt and waste fibre, as well as some of the good fibre of cotton, fell through the openings in such screens or gratings, and descended into compartments below the screen, formed by cross partitions placed at varying distances, from three to five feet apart; but the plaintiff claimed, and offered evidence tending to show, that the improvement which he claimed effected the separation and retention of foreign substances and waste fibre more completely and successfully than the old trunks, and produced new results that had not been before produced, and thus produced the benefits and advantages set forth in his several specifications by means of the several improvements therein claimed. And thereupon the defendants requested the court to rule upon the several letters patent, A, B, and C, as follows: First, that the patent of December 1, 1857 (B), covered an elongated trunk, having partitions covered by a woven wire screen, whose crossings are filled with metal, cement, or shellac varnish, or any other varnish that will answer the purpose, such trunk to be used for the purpose of cleaning cotton, in connection with any opening and beating machine which can be made to produce either a blast or suction, with or without the aid of a fan, to assist in passing the cotton through the trunk over the screen. Second, that the patent B was inoperative and void; because the thing therein described and claimed was fully described, but not claimed, in patent A, and was, therefore, by the legal operation of patent A, surrendered to public use, if it was the invention of the plaintiff, before patent B was applied for. Third, that patent B was inoperative and void, because it described and claimed what was also embraced by the claim of patent C.

The court, in accordance with the first prayer of the defendants' counsel, did rule upon the construction of the said patent B as follows, namely, that the patent of December 1, 1857 (B), covered an elongated trunk, having partitions covered by a woven wire screen, whose crossings are filled with metal, cement, or shellac varnish, or any other varnish that will answer the purpose; such trunk to be used for the purpose of cleaning cotton, in connection with any opening and beating machine which can be made to produce either a blast or a suction, with or without the aid of a fan, to assist in passing the cotton through the trunk over the screen. But the court refused to rule the patent B to be inoperative and void by rea-

son of the legal effect of the patent A. And the court further ruled, that the patent of September 11, 1860 (C), embraced what was already covered by the patent of December 1, 1857 (B), but refused to rule that patent B was inoperative and void by reason of the legal effect of patent C. And thereupon the patent C, after the evidence on both sides was closed, and before the case went to the jury, was withdrawn from the case by the plaintiff's counsel, and the jury found a verdict for the plaintiff upon the patent of December 1, 1857 (B).

The claims of these several patents were as follows:

Patent A, March 17, 1857: "Increasing the area of the trunk above the screen, or making it larger towards its rear end, by increasing its height or width, or both, as may be desirable, so that the blast of air which conveys the materials into or through the trunk will move gradually slower, so as to allow the light and fine, or such portions as are intended to be separated, time to be precipitated and pass through the screen before the air which holds them in suspension escapes from or passes out of the trunk. Second. And in combination with a trunk made gradually larger toward its rear end, as above claimed, I claim a screen of woven wire or twine arranged upon a series of partitions, as set forth."

Patent B, December 1, 1857: "Covering the partitions of an elongated trunk or box for cleaning cotton and other fibrous substances with woven wire, having the scores formed by the weft crossing the warp of said wire screen filled with metal or cement; the whole combined in the manner and for the purposes set forth."

Patent C, September 11, 1860: "A trunk for cleaning cotton and other substances, divided horizontally or centrally with a screen of woven wire or twine, with cells or compartments under said screen, so small as to prevent or break the current of air under said screen, substantially as described, in combination with a machine substantially such as is described in this specification, or its equivalent, for opening the cotton and blowing it through said trunk over the screen, substantially as described."

Henry F. Durant and William Whiting, for plaintiff.

Cáusten Browne, George T. Curtis, and Caleb Cushing, for defendants.

SPRAGUE, District Judge (charging the jury). This is a suit upon a patent which the defendants are alleged to have used, thereby violating the exclusive rights which the plaintiff claims.

A patent right, gentlemen, is a right given to a man by law where he has a valid patent, and, as a legal right, is just as sacred as any right of property, and no more so; and questions respecting it are to be tried

in a court of justice in the same manner as all other rights which may have been infringed. They are to be decided according to the law and the evidence.

There are three general questions, gentlemen, that may arise. The first necessarily is whether this patent is valid. If it be, then the question arises, whether the defendants have infringed; and if so, the next question is as to the amount of damages.

The first and great question, which has occupied the greatest part of the time, is of the validity of the patent. The plaintiff having obtained a patent from the government, it is incumbent on him, in the first instance, to produce the evidence of his having that grant to the exclusive privilege—to the invention; and when he produces that evidence he has performed that duty; he has laid before you his patent, and the presumption is that it is a valid one.

It makes a prima facie case for the plaintiff in the question of title. The defendant then undertakes to overthrow it by showing some reason why it ought not to have been granted to him—why, therefore, it is not valid in law. The reason assigned here, gentlemen, is that the plaintiff, Hayden, the patentee, was not the first inventor of the thing patented; and that is the sole ground upon which it is contended that this patent is not legal and valid.

To that, then, you will direct your inquiry in the first instance—was Hayden the first inventor? Because if he was not, whether or not he himself knew that it existed before, if in fact it was before known, although he may have been an inventor, an original inventor, yet, if he was not the first inventor, it would not give him any exclusive privilege. The public had a right to it before he invented it; he was not the first inventor, and the officers of the government had no authority, by law, to grant exclusive right to an individual of that to which the public had a previous right.

Was he then, gentlemen, the first inventor? The burden of proof to show that he was not, is upon the defendants, and they must maintain the allegation by a preponderance of the evidence to be entitled to the verdict.

There are, then, two instruments; first, the machines used at Chicopee, and then those used by the Suffolk Company. With regard to the trunks used at Chicopee, I do not understand that it is contended by the counsel for the defendants that they were the same as the plaintiff's; so as to invalidate the plaintiff's patent; but they are relied upon as showing that certain steps were taken anterior to the plaintiff's patent, which diminish any merit or claim that he may have by virtue of his patent, by narrowing down the extent of his invention. The plaintiff's invention is said to have been completed—and I believe there is no controversy upon that—in 1853. Those trunks, at Chicopee, were prior to that.

Now, gentlemen, it is necessary for you to determine, in the first place, what those trunks were, and for that purpose you should examine the evidence. There is controversy in the evidence as to what they were. It is for you to determine whether they did contain the wire screen or not; and how far it was similar to the wire screen which the plaintiff sets forth in his patent; and which constitutes one of the material parts in his invention. And so far as you find that it was similar—that there was a wire screen in those trunks, and so far as you find that they were substantially like the plaintiff's—so far as you find them alike, so far the invention had gone into use; the invention of the wire screen in trunks for cleaning cotton. But, as I observed before, it not being contended that they were so like the plaintiff's as to invalidate the patent, I have no occasion to dwell upon whether the plaintiff's patent is invalidated or not.

You come then, gentlemen, to the machine from the Suffolk Company, about which the great question has been raised in regard to priority. Now, then, you are to compare two things; and the first step toward making a comparison is to ascertain what the two things are which you are to compare together. The thing secured by the plaintiff's patent is to be compared with the trunk used by the Suffolk Company; there being no controversy as to the dates here, as the trunk relied upon was used prior to the invention in 1853.

It is necessary, then, for you carefully to examine and see what the plaintiff's patent is for, and what it secures to him.

This patent, gentlemen, is divided into two parts—the specification and the claim; the claim being the conclusion which has been referred to, and setting forth distinctly what it is he claims as his invention, and asks to be secured to him by his patent. The specification, which precedes that, is referred to, read and examined, in connection with the claim, only to explain the claim and ascertain its true extent. We look at the claim in the first instance—which is this: "Covering the partitions of an elongated trunk or box for cleaning cotton, or other fibrous substances, with a screen of woven wire, with the scores crossing the wire filled with metal or cement—the whole combined in the manner and for the purposes set forth in the specification."

Now, gentlemen, you will analyze this and examine it; and see what are the essentials of the invention which is thus secured to him.

In the first place, there is an elongated box or trunk. In the next place, there are at the bottom of that, partitions. In the third place, covering those partitions, is a screen of woven wire, and then a particular characteristic given to that description over and above the description of its being one of woven wire, by saying: "Having its cross-

ings filled—having its scores filled with metal or cement." Then, gentlemen, those three things having been enumerated, it goes on to say, "the whole combined in the manner and for the purposes set forth in the previous specification."

As to the box, gentlemen, the only description of the box given, is, that it is a trunk, an elongated trunk for the purpose of cleaning cotton or other fibrous substances. I have not been requested to undertake to explain to you what an elongated trunk is. I have no occasion to go further than to leave it to your own judgment to determine what that description of a trunk is.

I am not aware that there is any particular controversy or question about the partitions underneath, nor any particular desire that the court should give you any explanation as to the meaning of the patent in relation to those partitions. The screen, then, of woven wire, is to cover this; and that screen must have its scores filled with metal or cement. And here, gentlemen, there is a reference, as there is throughout, to be had to the specification that precedes, which specification undertakes to set forth what the invention is, and to give instructions how to make an instrument—the improvement which the plaintiff says that he has made. I have not examined the drawing, but you can do so if it throws any light upon the question. In that part of the specification which speaks of filling the scores, he says it may be done with metal, and then says by metal of a certain description, and he then says how it may be applied—by dipping the wire in it. It says further, that shellac varnish may be used—a varnish made of shellac and alcohol; therefore, gentlemen, as it is said expressly in the specification that varnish may be used for filling the scores, it makes the shellac varnish equivalent to the cement, as an equivalent mode of filling the scores; and not only expressly says that it may be used, but gives instructions as to the better mode of applying it, in order to fill the scores if that mode be adopted. It tells in what the shellac should be dissolved, and if only the upper side of the screen is to be covered by the varnish, in order to fill the scores, how it should lie, horizontally, and the first coat should be put on by brushing across, and the next coat by brushing lengthwise, and directions to accomplish the end by filling the scores if that material should be adopted by the constructor. And that is an essential part of this invention, so that if a person should use the elongated trunk, with its partitions covered by a screen of woven wire and combined in the manner set forth, and the scores of that screen were not filled with metal, cement, or what is equivalent to that as set forth in the patent for filling them—then it would be no violation of the plaintiff's patent. And so, if any other person has made such an instrument before it would not invalidate the plaintiff's patent. This is

not controverted, and I lay it down to you as the law applicable to the case.

Now, gentlemen, the plaintiff's machine, as described in his patent, is to govern you; any machines or models produced are only to illustrate what is in the patent; if they differ, the patent is to govern, for all that is secured or patented is that which is in his patent, and it secures all that is in his patent.

When you have satisfied yourselves, gentlemen, as far as is necessary, what the plaintiff's invention, as secured by his patent is, you will then turn your attention to see what was the prior machine which is said to have existed, so as to invalidate his patent, for want of novelty—and that is, the Wright trunk.

Now, gentlemen, a difficulty presents itself in that investigation, and that is, you have not that trunk here—no patent for it. Where a question arises as to what a machine or structure was at a former period, and especially which goes back for years—and, in this instance, I think about seventeen years—I think to about 1845; but whether old or recent, when you have to compare two things, one of them a structure or machine, it is a great satisfaction to have the structure or the machine before you, if it is a possible thing; or if it be of a size and character that it can not be brought into court, to have it now existing, so as to be open to examination, so that those persons who are interested in knowing what it is, having access to it, can make, by measurements or inspection, an exact model of what it is, and bring it into court, and show you what the thing is exactly. But, gentlemen, that trunk has passed away; it is not now, so far as the evidence goes, in existence, and that means, therefore, for ascertaining the character of it does not exist.

The next means would be a model that had been made of a former machine, or structure, at the time it did exist. You have no such model. Then a written description made at the time for the purpose of accurately delineating and setting forth what the machine or structure was; as in a patent or other description made for some important purpose—it is all very important, if you can have it. The importance of it is in this, gentlemen, not only that it would contain a full, and it may be presumed an accurate description and delineation of the machine or structure; but that it was made at the time when it was certainly known what it was, and for the purpose of being a delineation, and has been subject to no change since; that is the importance of it, that when it is thus embodied in a model or in a written description or drawing, it remains unaffected by subsequent events. But in the want of such testimony, we must resort to the best that exists; and that is the memory of man.

Now, gentlemen, it is for you to weigh the evidence of every kind, and the evidence de-

rived from the testimony of witnesses upon the stand, taking into view, of course, all the circumstances, the facts which can enable you to form a correct judgment of the weight of the evidence, and how far you may rest upon it, satisfactorily. Two things are to be regarded in weighing the testimony of all who testify—the ability of the witness to tell the truth, and his disposition to tell the truth. These do not always go together. The ability to tell the truth as to past transactions, or those events that have transpired, may depend, in the first place, upon the accuracy of the observation, and in the accuracy of the knowledge at the time; then upon the occasion that the party has had to keep it in his mind and memory since; and in the tenacity of his memory, is his ability. His disposition, his moral integrity, or freedom from bias, may lead him to testify one way or the other.

Now, the accuracy of knowledge at the time, as well as the ability of the man to testify the truth, depend very much upon the subject-matter. Some things that men have a full, clear, and perfect knowledge of at the time they transpire, may not be of that interesting character that they retain them in their memory. There are other things of which their knowledge at the time may not be perfect; and when you come to the question of machinery, a question of structure, the question whether the person had a full knowledge at the time may depend upon his habit of accurate observation, and his opportunity of observing the particular structure or machine, and his intelligence or understanding of it. For if he had not a clear idea at the time, of course he can not have immediately afterward a very clear idea to communicate to others. You will consider, therefore, in weighing the evidence as to what it is that the witnesses undertake to describe, how far you can rely upon their memory in undertaking now to say what that was; so that you can ascertain the instrument, the operations and effects, so as to compare that with the plaintiff's machine.

Now, unfortunately, gentlemen, the witnesses differ in relation to this trunk at the Suffolk Mill. They differ, in the first place, as to the trunk itself. The whole structure would present itself differently to the eye of him who went into the room and looked at it attentively, or only gave a passing glance at it.

The witnesses for the defendant say that it was of the form of that which you have had, that it was in this room. building No. 3, connected with the opener; the opener facing to the westward, and the trunk extending at an angle from that toward the western wall, at the left, I think, some twenty-five feet, and then passing up in a curve through the ceiling into the room above, and then going horizontally eastward. That is the description of the external appearance of the trunk as given by the witnesses for the defendant.

The plaintiff's witnesses say that the trunk there was different; that, in the first place, the opener did not face to the westward, but eastwardly, toward the partition; and that the opener was only a few feet, or not far from that partition; that then the trunk from that went eastwardly, toward the partition, a few feet, and then went up in a curve more or less regular, then straight, and then another curve, extending along under the ceiling of the same room, westwardly, and then went up in a curve to the room above, and then horizontal, eastwardly, to cross over. That, I believe, is substantially the testimony of the witnesses for the plaintiff.

Here you are met, gentlemen, with apparently a conflict of testimony, which, so far as you deem important, you will compare, examine, and weigh, and say which, on the whole, you think preponderates. Then when you go to the internal structure, what was inside of it, there was a conflict of testimony between the witnesses. The defendants say that there was a wire gauze screen. The plaintiff's witnesses say that there was no wire screen there, or if any there, a very short distance from the opener toward the wall.

Now, gentlemen, that conflict of testimony you are to examine and consider, and say what is established—whether the inconsistencies in the recollection of the witnesses establish any thing; and if any thing, what?—or whether it leaves it in entire doubt; and if leaving it in entire doubt, then the party whose duty it is to prove it to you has not maintained the burden of proof.

Then there is another question that comes up. If that trunk had such a screen—had a screen of woven wire—were the scores filled with metal, or varnish, or cement, as required by the plaintiff's patent to make his instrument? And, gentlemen, instead of repeating the metal or cement, I shall hereafter speak only of the varnish. because that is the only thing that is in controversy, and the only thing that is alleged to be used, and therefore the metal need not be repeated.

Now, gentlemen, the plaintiff's witnesses say that there was no screen there, or a very short one, and they do not speak particularly as to the varnish in the screen. because they did not see it. The defendants' witnesses speak of the varnish, and it is for you to consider the force and effect of that testimony. What is proved? The proposition is that the scores were filled—that is the thing you are to inquire about, whether the scores of that screen were filled with shellac varnish. I say shellac varnish, because it is not contended that there was any other varnish used; and if there were, there is no proof of any other varnish used that answered the purpose.

Now you will observe in the claim, in the first place, it is said metal or cement; in the specification a certain thing is mentioned as equivalent to the metal, or what is set forth as equivalent—shellac varnish, or other kinds

of varnish that will answer the purposes of filling the scores to prevent the fiber of the cotton from sticking and hanging. What other kinds of varnish would accomplish that, gentlemen, we have had no evidence; and, therefore, if some other kind of varnish were used than shellac varnish, we have no evidence whether that kind, whatever it may have been, would have been of that kind of varnish named in the specification which would accomplish the object sought. You will look, then, to the evidence, gentlemen, in the first place, and see whether there was any direct evidence that the scores were filled; and now by direct evidence I mean by evidence of the person who says that he looked at the scores and saw that they were filled, or that they had been filled; saw that at the time when he looked at them that they were filled with shellac varnish. There is no such person here, that I recollect, who undertakes to say, that looking at that screen he saw that those scores were filled with shellac varnish. How then, gentlemen, is it sought to establish that it was? It is from the evidence that the varnish was put upon the screen. Well, then; the inquiry is, was varnish put upon the screen? That is one inquiry. If it was, in what manner was it put on, and to what extent? and is it shown to you so that you are satisfied that it did accomplish the purpose of filling the scores? Because if it did not accomplish that purpose, then the scores were not filled; and if the scores were not filled, it is not the plaintiff's screen.

You must look at the evidence, therefore, and satisfy yourselves. It is said by some of the witnesses (I do not mean to detail the evidence), whether more than one I do not recollect, because it is not my purpose to detail the evidence, that three coats were put on. In what manner? Well, gentlemen, you will look at the evidence and see. In the first place, were there three coats, and in what manner were they put on?

Now, gentlemen, it may be material—you are to determine how far it is material—to consider whether there is any evidence that the varnish was put on for the purpose of filling the scores, or for some other purpose.

If the varnish was put on for the purpose of filling the scores; if that was the purpose and object in the mind of the party who directed it to be put on, there would naturally arise a presumption that if the party was competent for his work, that he accomplished the purpose for which he did it; but if there was no such purpose, and that this was only an accidental result of putting it on for some other purpose, then you will judge whether there is any presumption that that was the accidental result, from the fact that it was put on. It may have been the result, although not intended, and that is for you to determine in considering the weight of evidence. If you take that into view you will see how far the presumption

arises, and look at the purpose there was in putting on the varnish.

Now, gentlemen, you will consider whether it is proved to you that the scores were filled with varnish, and if proved to you that they were filled with varnish, is it proved to you that it was shellac varnish; and you will go back and see what the testimony is in that respect, and see whether there are witnesses that spoke of it; what were their means of knowledge, at the time, of what kind the varnish was; whether you can rely upon their memory, at this time, to tell you what the varnish was, so as to satisfy you that the scores were actually filled, and with shellac varnish.

That, gentlemen, I leave to you for your determination whether that has been established. If it is not by the preponderance of evidence, then that essential part of the plaintiff's patent did not exist upon the Suffolk machine.

Gentlemen, I have thus far proceeded in calling your attention to matters to aid you in ascertaining what the structure was in the Suffolk Mills—in making a comparison between the invention that is patented, and the machine that is said to have previously existed, in order to ascertain whether they were substantially the same. Other things may be taken into view beside the mechanical structure, the mode of operation and the effects produced.

And then, gentlemen, you have to go back and ascertain the mode of operation, and the effects; particularly the mode of operation, if the structure differs.

Accordingly as the mechanical instrument is changed, its operation is changed, and the effects; and you must go back in order to make a comparison, and look at the evidence to see what were the effects of Mr. Hayden's trunk. All the time I speak of Mr. Hayden's trunk, I mean his trunk as set forth in the patent. You have the evidence of that, but I will say you must look at the evidence and see what were the effects of his patented machine; and then look at the Suffolk machine, and see what were the effects produced by that, and then, comparing the two, you will be aided in forming a judgment whether they were substantially the same, or not; and to what extent they were similar, and to what extent they differ. If the effect is the same, there is no presumption that there is a difference in the structure. If the effects are different, it is a matter to be weighed by the jury how far is the difference between the causes, where they produce different effects. Although there has been, gentlemen, a great deal of evidence in that respect, as to the effects produced, I shall not go into the details of the evidence, for the remarks made as to the character and the weighing of evidence, apply to this as to all other parts of the case.

There is another thing to be taken into your consideration, gentlemen. Supposing that so

far as the testimony has been presented to you, the trunk and its contents in the Suffolk Mill were apparently the same as the plaintiff's, another question may arise still—whether that was what may be denominated a perfected invention? Because if it were not, then it was not prior in the eye of the law, so as to defeat a subsequent inventor—and by a perfected invention, I mean one that is brought to such a condition as to be capable of practical use. Now, gentlemen, by that test, was that trunk at the Suffolk Mills brought to such a condition as to be of practical use? If it was an experiment, or a series of experiments, and ended in experiment merely and then abandoned; then, gentlemen, it was not perfected in the eye of the law, so as to invalidate a subsequent patent obtained by another inventor. And in this view, therefore, gentlemen, to ascertain whether it was perfected in the sense I have explained to you, you will go back and see what the evidence is of its effects and application; and here is a conflict of evidence for you to examine, to weigh, and consider.

In determining the question, whether the mode of operation was the same, you will look not only at the evidence of the invention; you will look at the structure, the evidence of the structure; the evidence of the mode of operation; the evidence of the effect produced—that all goes to show whether it was an invention completed, perfected so as to be capable of practical use.

There is another thing, gentlemen, which you are to take into view, and which may have a bearing upon this question of its being a perfected machine, or not—primarily, has a bearing upon the question of what the machine really was that was there; and whether it was a perfected invention—and that is, its abandonment. It is a matter for you to weigh. If there were experiments made, gentlemen, and they tend to a certain point, and there is no certainty to what extent they went, then the subsequent conduct of the parties who made experiments, and were interested in it, may aid you in forming an opinion of what they accomplished. If they preserved it as a thing valuable, it has a weight in one direction as showing that they had accomplished something. If they did not preserve it but abandoned it—the evidence is to be weighed whether it was abandoned or not; whether a success had been obtained in any thing that was worthy of preservation, or could accomplish a practical and useful purpose; and the weight of this you will probably know is in proportion to the importance of the thing. There may be an invention, gentlemen, of so unimportant a character, that although it be really an invention, something of practical use, it may be in relation to a subject matter of so little importance, or of transient interest, that the occasion may pass by and it may be laid aside and never used afterward,

because there is no occasion for it, as there are many patents for articles of dress of the day, which are patented for the day, while the fashion lasts, and pass away when the fashion passes away. On the other hand, if the invention be of something which can be of great practical importance, an enduring importance, then you will consider how much stronger will be the incentive to success in perfecting that which would have been of importance; and the greater the importance of the invention, the less probable that if achieved it would have been laid aside and not extended itself to others interested in its use.

Gentlemen, this is, as I have already mentioned to you, a question of what existed some seventeen years ago. Now, I think it proper to say to you, that where an invention of any useful machine or structure, or improvement in any machine, is shown to have been made, and it is sought to be invalidated by an old machine made years ago, the jury should examine the testimony and the evidence with care and caution, so as to be satisfied that that which is said to have existed, was actually and substantially the same.

The rule of law is a reasonable one; at all events it is a rule of law, that a party who sets up such an old instrument that has passed away, has upon him the burden of satisfying the jury upon a preponderance of evidence that it is substantially the same as what has taken place, before they will set aside the patent. If they are so satisfied by the evidence, that it was substantially the same and known before, then it is their duty so to say when considering the patent.

I come now, gentlemen, to another thing. If you are satisfied that the plaintiff was not the first inventor, then his patent is invalid, you have no occasion to go further, and must return a verdict for the defendants. If you are not satisfied, gentlemen, you come to another question: Whether the defendants have used the thing patented—whether they have infringed. And here the burden of proof is upon the plaintiff; because although the plaintiff's patent creates a prima facie case for him, as to the validity of the patent, it creates no presumption that any person has infringed upon it. And there is an admission, in this case, gentlemen, as to what the defendant uses, and has used, and did use, at the time before this action was brought; and there is also testimony in the case, of the character of the trunk, particularly as to one of the trunks, by Mr. Crane, of Lowell. He testifies that he made a trunk, which was sold to the defendants, and that it was made exactly as Mr. Hayden's trunk was; that it was sold to the defendants, and has been used by them since. You will, therefore, consider whether it is proved to you, whether the defendants have used the plaintiff's invention, or not. If they have not, why then the verdict must be for the defendants. If they

have, then you come one step further, and your duty will be to inquire what damages shall be given to the plaintiff for the infringement of his right. There was an agreement as to the time when they began—from June 30, 1858, to the day of the writ, April 13, 1861, for trunks—these dates, gentlemen, will be material to carry with you. Now, gentlemen, if you find this patent of the plaintiff has been infringed, you will inquire about the amount of damages. The general rule is that you will give to him the actual damage he has sustained, then you will look at the length of time, in the first place, that they have used the trunks. And here it is material to bear in mind that your verdict, if you give a verdict for the plaintiff, in damages, covers only the use from the beginning stated in June 1858, up to the date of the writ, in April, 1861. If the defendants have used the machine since, they are liable over and above what you will give in your verdict to pay the plaintiff for such use since. Your verdict will cover no use except up to the time of the date of the writ—that was all that was sued for; and, therefore, for all since that time, the defendants are liable in another suit by the plaintiff. You are also to remember that if you render a verdict for the plaintiff, it will not give to the defendants any right to use any of these trunks hereafter. It is not like a license to use a trunk during the existence of the patent, but so far from being any right to use them hereafter, the plaintiff may apply to this court for an injunction—that is, for an order of court to prevent their using them. That will be his right if the infringement is established, and you are then to give damages from June, 1858, to the date of the writ, for the use during that time, and such actual damages as the plaintiff has sustained.

Now you have heard from the counsel various means for ascertaining it. You are to take the whole evidence, so far as it is applicable to that question, and inform your judgment from the whole. There is some evidence derived from General Oliver and Mr. Southworth, of the use, by the Atlantic Company, in Lawrence, and the company over which Mr. Southworth presides, in Lowell, of this machine of Mr. Hayden's, by his consent, under particular circumstances, and its being subsequently referred to them, in connection with Mr. Thatcher, to determine what compensation should be paid. I understand, whether I am right or not, that that was in compensation for the use of it, as a license, during the existence of the patent, to use the thing; and they fixed upon a certain compensation which was named to you by General Oliver. That was not, as Mr. Southworth says, satisfactory to Mr. Hayden, and is not taken as any price that he fixed, or any agreement that that was a fair compensation to use his patent for the length of time, or a fair compensation for the circumstances under which he began to use

it. But as that is evidence in the case, you will take it into view, and give it such weight as it deserves in estimating the damage to the plaintiff. Then you will look at the value of the thing used, to ascertain that value, by all the evidence that there is in the case as to its character and performance and effects. Look at the value of that which the defendants have used as belonging to the plaintiff, and that may aid you in forming a judgment of the actual damage the plaintiff has sustained.

And here, gentlemen, I will remark, that you are to look at this in ascertaining the actual damage, as you would in any other case of property belonging to one man that has been used by another, to ascertain how much of the rights of one man have been appropriated, temporarily, by another; how much actual damage is sustained by the party whose right has been infringed—to look at it calmly and coolly, as you would in relation to any other.

And, incidentally, it has been mentioned in the course of the examination with respect to the position of the plaintiff, and the capital of the defendants. The learned counsel have not presented you that as a ground for an increase or diminution of damages; but as these things have come out, I may suggest what your own good sense, no doubt, will suggest, that it is wholly immaterial what is the character or condition of the plaintiff or defendants. You do not know, gentlemen, because there is no evidence in the case, and the evidence could not be brought into the case to show you, whether the plaintiff is a poor man or a rich man. You do not know whether the defendants are poor or rich. It is said that their capital is six hundred thousand dollars. Whether they have lost all that by unfortunate operations and are now worth nothing, or whether they have doubled it, you do not know, gentlemen; and the reason you do not know is, that it is not a proper thing to be taken into account in the case. It is not evidence in the case as to the character or condition of the one party or the other. You are to give the same verdict against these defendants, whether it would ruin them, because they are not able to pay one hundred dollars, or five dollars, or whether they were worth a million; and you are to give Mr. Hayden the same amount in this case, whether he is worth nothing, or whether he is worth millions of dollars; equal justice, in both cases, covered by the consideration of the actual damage sustained. You rest, gentlemen, upon your judgment, not on any matter of imagination or feeling; but in exercising your reasoning coolly, your sound judgment will, no doubt, arrive at a satisfactory conclusion, as in all other parts of the case.

I have been requested to say one thing which I believe, however, has been already involved in what I have said. If you come to the question of damages, gentlemen, in considering

that Mr. Hayden is to be paid the actual damage he has sustained by the defendants having used what he invented, and, therefore, you are to determine what he did invent. If the wire screen was used before his invention in the trunk, and he did not invent that use of it in that combination, you may take that into view. If the addition was only of the varnish, for example, or for any one particular, you will take that into view. If he invented the whole, the application of the wire screen, as well as the mode of preparing the screen by filling the scores, you will take that into view. You will take into view what it is that the plaintiff did invent, and what it is of Mr. Hayden's that the defendants have used, as shown by the evidence in the case, in determining what the amount of damage has been.

The jury returned a verdict for the plaintiff; damages, $1,744, equivalent to about $150 per annum for the use of each machine, or two and eight-tenths cents per spindle per annum.

[NOTE. A writ of error was then sued out by the defendant. and the judgment was affirmed by the supreme court in an opinion by Mr. Justice Nelson, who said that no dedication of the first invention to the public resulted from the claim in the second application. Where there is no established license fee, general evidence may be resorted to in order to get at the measure of damages. Damages should not be awarded for the whole term of the patent, but only for the period of the infringement. Such recovery does not vest the infringer with the right to continue the use. 3 Wall. (70 U. S.) 315.
[For other cases involving patents Nos. 18,-742 and 29,971, see Hayden v. Great Falls Manuf'g Co., 3 Fed. 519, and Hayden v. Oriental Mills, 22 Fed. 103.]