UNION STEAM-PUMP CO. v. BATTLE CREEK STEAM-PUMP CO. et al.

(Circuit Court of Appeals, Sixth Circuit.    October 2, 1900.)

No. 812.

1. PATENTS—SUIT FOR INFRINGEMENT—ESTOPPEL BY PRIOR ADJUDICATION.
   To sustain a defense of estoppel in a suit for infringement by a prior adjudication between the same parties in relation to the same patents, the proofs must show that the identical claims of the patents and parts of the patented device were involved in the two suits.

2. SAME—CONSTRUCTION OF CLAIMS—SCOPE OF INVENTION.
   The claims of a patent, unless they are restricted in terms or by necessary implication, will include all changes of form, whether of size or

104 F.—22

shape, or changes in location of the parts of a combination, if the mode of operation is not changed, and the parts still perform the same duty.

**3. SAME—SEPARATE IMPROVERS—EQUIVALENTS.**

In patents granted to different improvers on former constructions designed to produce the same result the invention of each is measured by his improvement. One cannot invoke the doctrine of equivalents against another merely because a part produces the same or a similar result.

**4. SAME—INFRINGEMENT—STEAM VALVES.**

The Frost patent, No. 428,672, for improvements in steam engines, relating particularly to steam-actuated valves controlling the admission of steam into the cylinder, was not anticipated, and is valid; but such patent is not infringed by the device shown in the Metcalf patent, No. 442,905, which does not employ a steam reservoir external to the cylinder, which is the distinguishing feature of the Frost invention.

Appeal from the Circuit Court of the United States for the Eastern District of Michigan.

The bill of complaint in this cause charges the infringement of rights secured by letters patent Nos. 428,672 and 431,045, issued to Richard L. Frost, as assignor to the Union Manufacturing Company, a name by which the complainant was formerly known, it having been since changed by amendment of its articles of incorporation. The first of these patents is dated May 27, 1890, and the second July 1, 1890. Both relate to the construction of steam engines, and particularly to the valves by which the admission of steam is controlled. These valves have been mainly used in the construction of engines for steam pumps. The infringement complained of consists of the alleged manufacture and sale by the defendants of steam valves made under letters patent No. 442,905, issued December 16, 1890, to Foster M. Metcalf, upon an application filed July 9, 1890. The defendants, by their answer, deny that Frost was the first inventor of the valve shown by his patents. They also deny infringement, and aver that the valves manufactured and sold by them were made under and in accordance with certain letters patent owned by them, and especially No. 394,656, dated December 18, 1888, and No. 409,851, dated August 27, 1889, both of which were granted to Elon A. Marsh. The answer further states that the defendant Battle Creek Steam-Pump Company formerly bore the name of the Battle Creek Machinery Company, and that while it bore that name it brought suit in the circuit court of the United States for the Eastern district of Michigan against the present complainant while it was known as the Union Manufacturing Company, alleging infringement by the latter of the Marsh patent, No. 394,656, by the manufacture of steam pumps such as are shown in the above-mentioned Frost patents, and that on final hearing it was found and decreed that the Union Manufacturing Company had infringed the said Marsh patent, and an injunction was ordered against the last-named company, which is still in force. To this answer a replication was duly filed. Proofs were taken by both parties. It was held by the court on final hearing that, if the Frost patents are valid (a question not decided), they stand on such narrow ground that they were not infringed by the defendants. The bill was accordingly dismissed. The complainant has appealed. So much of the evidence as is deemed by the court to be material is stated in the opinion which follows.

Fred L. Chappell, for appellant.

Cyrus E. Lothrop, for appellees.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

SEVERENS, Circuit Judge, after making the foregoing statement, delivered the opinion of the court:

It appears from the opinion of the learned judge who heard this case at the circuit that some stress was there laid upon a decree sup-

posed to have been rendered in a former suit relating to their respective patents between these companies while they were doing business under other names, as mentioned in the preceding statement, wherein the Frost patents, Nos. 428,672 and 431,045, were declared to be invasions of rights secured by the Marsh patent, No. 394,656. The court seems to have regarded the decree in that case as settling for these parties certain questions now involved. Probably the argument in that court took a wider range than the record warranted, and the court took the statements of counsel upon some matters of fact. We find nothing in the record here which justifies the setting up of that decree as an estoppel, or as determining anything pertinent to the present controversy. The averments in the answer in regard to that suit and the nature of the questions there put in issue are quite general. The defendants offered no proof of the pleadings in that case nor of the decree rendered therein. It is suggested by the counsel for the appellees that a certified copy of the opinion of the court in such former case has been filed here for our examination, in case we desire it. In this state of things, it is quite manifest that no support is found on which to base any estoppel on any branch of the case. It may be that questions were there involved and decided concerning other claims of the patents and other parts of steam engines in steam pumps. We do not know, and estoppels must be certain.

It is necessary to look into the condition of the art at the date of Frost's inventions relating to valves in steam engines controlling the admission of steam from the steam chest into the cylinder. For a long period prior to the use of independently actuated valves, such as are here described, the customary way to control the transmission of steam from the chest to the cylinder was by a valve actuated to open and close the ports by a rod connected with an eccentric located upon the main shaft of the engine. Of course, something was to be gained if the eccentric and the rod connecting it with the steam valve could be dispensed with by the provision of means for bringing the steam directly from the chest to the actuation of the valve, instead of employing the power of the steam through the engine, the eccentric, and its rod, for that purpose. It would save the loss of some power in transmission and some cost in machinery. Prior to Frost's invention several inventors had obtained patents for devices tending to the accomplishment of this object. Among these was a patent to McFaul, No. 178,792, dated June 13, 1876; one to J. A. Tilden, No. 248,834, of October 25, 1881; one to Brazell, No. 271,181, of date February 16, 1883; and a still earlier one to Washburn, No. 98,725. Later than all these came the Marsh patents, already mentioned, of 1888 and 1889. It will not be necessary to analyze all of these in detail. It will be sufficient for the present purpose to state the progress which had been made prior to the applications for the Frost patents, and then to identify his inventions. Generally speaking, there had been patented devices for actuating steam valves of this kind, by which live steam was taken from the steam chest through ports and passages into the cylinder, or into a peripheral depression in a prolonged piston head moving through the cylinder, and from

thence to the chambers at the outer ends of the valve, the latter being provided with heads somewhat of the form of piston heads. In this latter form of construction the piston head was required to be made very long in order to take in the inlet opening in the cylinder for the steam from the steam chest (which opening was about midway of the length of the cylinder), and one of the two openings in the cylinder located near the ends thereof, respectively, through which the steam was taken alternately to the respective ends of the valve. When the piston head was at one end of the cylinder, the port to the passage to the head of the valve would be open, and steam connection was effected directly from the chest to one end of the valve. When the piston head moved to the other end, the port for the steam to the valve at that end would be opened and the port at the opposite end of the cylinder would be shut off. Thus, by the reciprocating motion of the piston, the valve was correspondingly moved over the adits for steam from the chest into the cylinder for its general work, which was, as above stated, the function of the valve when actuated by the eccentric gear. This was the form of construction in the Marsh patents. Another form was shown by McFaul's patent, in which, instead of live steam from the chest, cylinder steam—that is, steam which had been already used in the cylinder—was transmitted through passages opening from the cylinder to the ends of the valve, respectively. In this connection it is proper to notice the Barth patent of March, 1889. In this patent, also, the valve was actuated by cylinder steam taken by an opening through the piston head and rod to relief ports in the latter, from whence it passed through openings at the proper places in the cylinder head and a prolongation thereof, and thence by passages to the respective ends of the valve. There was no reservoir for holding steam after it left the cylinder until it reached its work at the ends of the valve. The same was true of the McFaul invention. Nor was it needed in either of them, for the port opened into the store of the cylinder. At the time of Frost's inventions, covered by the patents on which the suit was founded, the valve-operating devices consisted substantially of these two classes. In one of these live steam was used, which was stored in the piston head, and taken alternately from each end thereof to the ends of the valve. We judge from the evidence that the extraordinary length of the piston head required for this service, which was more than half the length of the cylinder, was a serious objection, in that it required the elongation of the cylinder to that extent. This largely increased the material of the engine and the cost of manufacturing it, and it rendered the piston head more complex and cumbersome in operation. The other class was that which took steam from the cylinder, dispensing with other store room. It seems to be established by the proofs that the use of cylinder steam is objectionable, and both parties agree that for reasons stated the use of live steam for this purpose, if not essential, is greatly to be preferred. Frost undertook to remedy these defects in the existing devices for operating the valve. He brought live steam from the chest to a reservoir outside of the cylinder, thereby restoring the piston head to its normal proportions, and he contrived means for getting the steam

through the piston, and thence to the heads of the valve, securing the necessary isochronous movements of valve and piston without incumbering the cylinder with the means employed. It seems to us that his invention was one of considerable merit, and made a distinct advance in the art to which it relates. It is entitled to protection in the field covered by it. In his application for patent No. 428,672 it was stated by Frost that "the object of the present invention consists in certain changes in the steam chest, and in providing a secondary steam chest or receiver, and in a peculiar construction of the piston in connection with said steam chest." The last two of these elements constituted the main features of his invention. The remodeling of the steam chest was merely the mechanical work made necessary by the more important changes. The following are Figs. 1 and 2 of the drawings, and so much of the specifications as are necessary to an explanation thereof:

Fig. 1.

Fig. 2.

"Referring to the lettered parts of the drawings, R is the cylinder, and F is the piston head, having an annular depression, Z, in the periphery of said piston head, as shown in Fig. 2. At B is shown the steam chest having therein what is usually termed a 'float valve,' A, said valve having enlarged heads, C, C, at each end, which play back and forth in the internal enlargements, m, in the ends of the steam chest. Referring to Fig. 2, the valve, A, is shown, having an annular depression, 4, 4, at each end, and centrally at 1 and at 3, 3, between said center and end depressions. Each end of the valve, A, has a live steam port, e, leading from the annular depressions, 4, 4, internally and longitudinally through said valve into the annular depressions, 3, 3. These several depressions, 4, 4, 3, 3, and 1, may be termed 'annular steam ports.' This valve, A, is like the one shown in my prior application herein referred to. The ports, e, through the valve, are as clearly shown at right hand in Fig. 2. At P is the ordinary steam-supply pipe, and from said pipe the live steam ports, 5, 5, lead into the interior of the steam chest and into the steam passage, h, which leads into the cylinder, H, Figs. 1 and 2. D, D, are ports leading from the steam chest into each end of the cylinder, and E is the exhaust port. Ports, d, e, lead from either end of the steam chest into the cylinder, R. The piston rod, L, passes from the cylinder, R, through the stuffing boxes, 6, 6, in the steam receiver, H, and on into the pump, S, said pump, of course, being of the ordinary construction. Each end of this rod has a steam port, i, passing longitudinally through it from the steam receiver, H, and into the piston head, F, and leading thence out into the annular depression, z, in the periphery of said head. This port, i, has two openings, y, x, into the steam receiver, H, one of which is closed by passing into the stuffing box at each end of the stroke. Fig. 2 shows these ports at one end."

The substance of the present controversy rests upon claim 3:

"In an engine employing a steam-actuated valve in the steam chest, a steam receiver, and a piston rod extending into and having bearings in said receiver, the piston head of said rod having the peripheral depression, and a live steam passage leading through said rod and out through the head into said depression, which depression registers with the live steam ports leading to the ends of the valve, substantially as set forth."

The second Frost patent is, for the purposes of this suit, merely inert matter. Counsel for complainant contends that it is competent to be referred to as explanatory of the invention disclosed in the first patent. The suggestion is that the former may be broadened in its interpretation by reading backward from the particulars of the second patent. The meaning of this would be simply to expand, or diminish, or change the form of the parts of the combination with reference to each other according to the hints of the second patent. But there is nothing in all this. Without any auxiliary support, the claims of a patent, unless in terms or by necessary implication they are restricted, will include all changes of form, whether of size or shape, if the mode of operation is not changed. It is the character of the means employed, and not their dimensions or details of form, which denote the substance of an invention. Morey v. Lockwood, 8 Wall. 230, 19 L. Ed. 339; Ives v. Hamilton, 92 U. S. 431, 23 L. Ed. 426; Elizabeth v. Pavement Co., 97 U. S. 137, 24 L. Ed. 1000. So, too, the mere change of the location of the parts of a combination, if the parts still perform the same duty, and by the same mode of operation, will not take the structure out of the bounds of the patent. Northwestern Horse-Nail Co. v. New Haven Horse-Nail

Co. (C. C.) 28 Fed. 234, 238; Roller-Mill Co. v. Coombs (C. C.) 39 Fed. 25, 33; Knox v. Mining Co., 6 Sawy. 430, 438, Fed. Cas. No. 7,907; Devlin v. Paynter, 12 C. C. A. 188, 64 Fed. 398. If, however, such changes of size, form, or location effect a change in the principle or mode of operation such as breaks up the relation and co-operation of the parts, this results in such a change in the means as displaces the conception of the inventor, and takes the new structure outside of the patent. Brooks v. Fiske, 15 How. 212, 221, 14 L. Ed. 665; Manufacturing Co. v. Brill, 4 C. C. A. 374, 54 Fed. 380, 384; Gould v. Rees, 15 Wall. 187, 193, 21 L. Ed. 39. For example, the steam receiver in the Frost patents seems disproportionately large. If this is true, it would be a matter of mere mechanical skill to reduce it to proper proportions, and the mode of operation would not be changed. Probably, too, the location of the steam receiver might be changed, as was done in his second patent, without disturbing the identity of his invention.

We come now to the consideration of the Metcalf patent, which is the gist of the infringement of which complaint is made. This patent dispenses with a steam receiver external to the cylinder, but there is that in the construction of the other members which is to some extent a substitute for it, though not an equivalent, which we will refer to presently. The following is a copy of the drawing and the substance of the specifications referring thereto:

"A represents the engine cylinder, B the piston rod, P the piston head, C the live steam supply tube, and H is the head of the cylinder, of which the supply tube, C, is a fixture. The piston rod, B, is provided with a longitudinal channel or chamber, J, reaching a suitable portion of its length from its fixed end in the piston head, where the contiguous bushing or stuffing box, o, serves the purpose of a closure of the said longitudinal chamber, and in which the tube, C, has sliding engagement, as seen. Adjacent to the inner end of the bushing, o, a steam conduit, R, rises parallel with the face of the piston head, and connects the longitudinal chamber of the rod with the live steam annular chamber, M, situated between the packing rings, i, i, of the piston head, P. Firmly fixed centrally of the head, H, of the engine cylin-

der, is situated the supply steam tube, C, whose free opposite end reaches sufficiently near the end of the cylinder to secure telescopic engagement with the channel, J, of the piston rod throughout the reciprocations of the engine piston, as clearly seen in the drawing. From the fixed end of the tube, C, opens the steam passageway, W, leading from the live steam chest or other source of supply; and near each end of the engine cylinder valve-tripping steam passages, v, v, alternately connect the piston chamber or steam reservoir, M, with the end chambers of the valve at each reciprocation of the piston, whose pulsations are thereby actuated and controlled in manner following, to wit: Steam is conveyed from the chest through the passageway, W (dotted lines), to the tube, C, of the cylinder head, H, and delivered by means of the telescopically sliding chambered piston rod, B, and connected conduit, R, into the annular chamber or steam reservoir, M, of the piston head, whence it alternately passes through the valve-tripping passages, v, v, to the respective end chambers thereof, whereby the valve is moved to reverse the action of the engine piston."

It will be seen that the steam is taken by a passage coming through the cylinder head into and through a tube extending from the head into a channel in the rod. From the open end of the tube it passes back in a space between the tube and the rod to a passage in the cylinder head, and through that to a depression in the periphery of the head. This depression registers with a port in the cylinder at each end as the piston moves in opposite directions through the cylinder. A passage leading from each of these ports takes the steam to the ends of the valve, thus giving the isochronous movement of piston and valve which is essential to all the constructions to which we have referred. The learned judge who heard the case at the circuit considered that Metcalf had dispensed altogether with a steam reservoir, but it is proper to observe that in his specification he speaks of the channel in the rod as a "chamber," and of the depression in the periphery of the piston head as "the annular chamber or steam reservoir, M, of the piston head"; and it would seem a just inference that he intended the space between the tube and the rod and that in the annular periphery of the head as furnishing the necessary storage room for steam. But, if so, the fact remains that in this patent there is no steam reservoir outside of the cylinder, which was the prime idea of the Frost patents, but, such as they are, the means for taking steam after it is brought through the passage from the chest to the respective passages leading to the ends of the valve are located, receiver and all, entirely within the cylinder; in this respect according with the earlier Marsh and other patents. It is claimed by counsel for complainant that the reservoir of Frost finds an equivalent in the storage spaces for steam in the Metcalf patent, but we think this contention cannot be sustained. Where, as in this case, the invention is for an improvement upon former constructions designed and operated to produce similar results, the invention must be measured by the improvement. Things cannot be held to be equivalents simply because they produce the same or similar results. Barth used the channeled rod for the purpose of conveying steam from the outer end of the piston head through the cylinder to registering ports for passage to the ends of the valve. But his means did not provide for the use of live steam. Marsh

brought live steam into an "annular depression" in the cylinder head, from whence it was taken by passages leading to the ends of the valve, dispensing with intermediate means. Metcalf, by using Barth's idea of conveying the steam to the valve ports and passages through the piston rod, and making the necessary adaptations, and employing, but greatly modifying, the annular depression of the Marsh cylinder head, shortened up the latter, thereby removing to a great extent the objection which it was the purpose of Frost's invention to remedy. We have no occasion to express any opinion upon the question as to whether Metcalf's invention is adequate to the purpose. But we are constrained to the conclusion that he has not employed that feature of the Frost patent which constituted the distinguishing characteristic of the latter; that is to say, the steam reservoir external to the cylinder. As this element is not employed, there is no infringement. In the case of Snow v. Railway Co., 121 U. S. 617, 7 Sup. Ct. 1343, 30 L. Ed. 1004, where the facts were quite as favorable to the claim of infringement as in this, it was held that, the patentee having pointed out as a distinguishing feature of his invention that his piston head was detached from the rod, the defendant did not infringe by using a piston head and rod rigidly connected as a substitute therefor, although he employed the other features of the first invention. It seems probable, also, that the modes of operation of the remaining parts employed in these inventions are so far different that they could not, in view of the prior art, be held to be equivalents. Sharp comment is made by counsel for complainant upon the fact, appearing in the evidence, that, immediately upon Frost's invention obtaining publicity, Metcalf was employed to bring out something which would enable the defendant to also get over the objections to the faults of the Marsh inventions; that he examined the Frost patent with much care, and that "in a few days" he produced the scheme of the patent subsequently secured by him. The circumstances alluded to are calculated to excite close scrutiny, but they do not affect the conclusion which must be formed, when the essential facts are ascertained and duly considered. Cautious attention by inventors to what others have done in the same art is not of itself a fault, but a necessity rather. It follows that the decree of the circuit court dismissing the bill should be affirmed.